**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------X

In re:                                                          Chapter 11

AGDP HOLDING INC., *et al.,*                Case No. 25-11446 (MFW)
                                                                (Jointly Administered)

                            Debtors.

-------------------------------------------------------X

AGDP HOLDING INC., *et al.,*

                            Plaintiff,                    Adv. Proc. No. 25-51803 (MFW)

            v.

TVT Capital Source LLC, White Star Funding
Inc. d/b/a TVT Cap. Insta Funding LLC, and
Pinnacle Business Funding LLC,

                            Defendants.

-------------------------------------------------------X


**DEFENDANT WHITE STAR FUNDING INC.'S MEMORANDUM OF LAW IN
SUPPORT OF MOTION TO DISMISS DEBTORS' FIRST AMENDED COMPLAINT**


**CAROTHERS & HAUSWIRTH LLP**
Gregory W. Hauswirth (Bar No. 5679)
1007 N. Orange Street, 4th Floor
Wilmington, DE 19801
Telephone: (302) 332-7181
Facsimile: (412) 910-7510
Email: ghauswirth@ch-legal.com

-and-

**LEECH TISHMAN ROBINSON BROG, PLLC**
Steven B. Eichel (pro hac vice pending)
One Dag Hammarskjöld Plaza
885 Second Avenue, 3rd Floor
New York, NY 10022
Telephone: (212) 603-6300
Email: seichel@leechtishman.com

*Counsel for White Star Funding, Inc.*

**TABLE OF CONTENTS**

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING……………………………………...1

INTRODUCTION ……………………………………………………………………………………1

STATEMENT OF UNDISPUTED FACTS……………………………………….......................................2

    The Agreements …………………………………………………………………………...2

    The Lockbox ...……………………………………………………………………………4

    The First Amended Complaint……………………………………………………………5

LEGAL STANDARD ON A MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6) ……………………………………………………………………………5

LEGAL ARGUMENT……………………………………………………………………………6

I.    This Court should dismiss the portion of Count I that seeks to recover funds transferred to TVT Cap, because Debtors fail to allege any legal basis to support that relief …………………………………………………………………………………..6

II.    This Court should dismiss Count II, which seeks to avoid preferential transfers, because Debtors fail to plead (A) the identity of the debtor/transferor; (B) that the transfers enabled TVT Cap to receive more than it would have if the case was a Chapter 7 liquidation, etc.; and (C) that the claim was asserted based on reasonable due diligence …………………………………………………………………………7

    A.    Debtors fail to identify the debtor/transferor that made the alleged preferential transfers……………………………………………………………8

    B.    Debtors fail to plead that the alleged transfers enabled TVT Cap to receive more than it would have if the case was a Chapter 7 liquidation, the transfer had not been made, and TVT Cap received payment of such debt to the extent provided by the Bankruptcy Code…………………………………………..8

    C.    Debtors fail to allege that their claim to avoid preferential transfers was asserted based on reasonable due diligence…………………………………………9

III.    This Court should dismiss Count III because the plain language of the Agreements and Debtors' own allegations make clear that the transactions at issue were sales, not loans…………………………………………………………………………10

    A.    The Florida Commercial Financing Disclosure Law recognizes that accounts receivable purchase transactions are not loans…………………………11

i

B.    The terms of the Agreements and the substantive allegations in the First Amended Complaint make clear that Debtors and TVT Cap engaged in accounts receivable purchase transactions, not loans……………………………12

(i)    The Agreements contain true reconciliation provisions, which support the conclusion that the transactions were sales, not loans………..13

(ii)    The terms of the Agreements were indefinite, which also supports the conclusion that the transactions were sales, not loans………………..15

(iii)    The default provisions in the Agreements were not triggered when Debtors experienced a decline in revenue or filed for bankruptcy protection, which further supports the conclusion that the transactions were sales, not loans………………………………………...16

IV.    Even assuming *arguendo* that the transactions at issue were loans, this Court should still dismiss Count III because those loans were not usurious, and Debtors do not plead intent with the requisite specificity…………………………………………………17

V.    This Court should dismiss Count III to the extent Debtors seek to invalidate the Agreements as unconscionable, because Debtors fail to plead a viable claim for unconscionability under Florida Law…………………………………………………19

VI.    This Court should dismiss Count IV, which seeks avoidance of constructive fraudulent transfers, because Debtors do not to adequately plead that there was a transfer for less than reasonably equivalent value at a time when the Debtors were insolvent……………………………………………………………………………19

VII.    This Court should dismiss Count V to the extent Debtors seek equitable subordination, because Debtors fail to plead the elements of that claim…………………21

CONCLUSION…………………………………………………………………………………...23

ii

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...................................................................................................5, 6

*Beskrone v. Opengate Capital Grp., LLC (In re Pennysaver USA Publ'g, LLC)*,
   602 B.R. 256 (Bankr. D. Del. 2019) ....................................................................8

*Citicorp Venture Capital v. Comm. of Creditors Holding Unsecured Claims*,
   160 F.3d 982 (3d Cir. 1998) ...............................................................................22

*Craton Entm't, LLC v. Merch. Capital Grp., LLC*,
   314 So. 3d 627 (Fla. Dist. Ct. App. 2021) (per curiam), reh'g denied (Feb. 17,
   2021) .....................................................................................................................13

*Ctr. City Healthcare, LLC v. McKesson Plasma & Biologics LLC (In re Ctr. City
   Healthcare, LLC)*,
   641 B.R. 793 (Bankr. D. Del. 2022) ...........................................................19, 20

*Dixon v. Sharp*,
   276 So. 2d 817 (Fla. 1973) ..................................................................................18

*JLK Constr., LLC v. Alva Advance, LLC*,
   Nos. 23-50034, 23-4030, 2025 Bankr. LEXIS 1573 ...................................... *passim*

*In re McKenzie Contracting, LLC*,
   No. 24-01255, 2024 WL 3508375 (Bankr. M.D. Fla. July 19, 2024) ............ *passim*

*In re Mid-American Waste Sys.*,
   284 B.R. 53 (Bankr. D. Del. 2002) ......................................................................22

*Miller v. Easy Star Records (In re DA Liquidating Corp.)*,
   622 B.R. 172 (Bankr. D. Del. 2020) .....................................................................9

*Miller v. Nelson (In re Art Inst. of Phila. LLC)*,
   No. 20-50627, 2022 WL 18401591 (Bankr. D. Del. Jan. 12, 2022) .......................8

*Nolden v. Summit Fin. Corp.*,
   244 So. 3d 322 (Fla. Dist. Ct. App. 2018) ...........................................................11

iii

*Official Comm. of Unsecured Creditors v. LG Funding, LLC (In re Cornerstone Tower Servs.)*,
No. 16-40787, 2018 WL 6199131 (Bankr. D. Neb. Nov. 9, 2018) ............................................. 9

*Official Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC)*,
444 B.R. 51 (Bankr. D. Del. 2010) ..........................................................22

*Pendergast v. Sprint Nextel Corp.*,
592 F.3d 1119 (11th Cir. 2010) ............................................................19

*Phillips v. Josmic 2 LLC (In re ONH AFC CS Inv'rs, LLC)*,
671 B.R. 680 (Bankr. D. Del. 2025) .......................................................20

*Pinktoe Liquidation Trust v. Charlotte Olympia Dellal (In re Pinktoe Tarantula Ltd)*,
No. 20-50597, 2023 WL 2960894 (Bankr. D. Del. Apr. 14, 2023) ....................................7, 9

*Schmidt v. Skolas*,
770 F.3d 241 (3d Cir. 2014) ...............................................................6

*In re Transcapital Fin. Corp.*,
433 B.R. 900 (Bankr. S.D. Fla. 2010) .................................................10, 18

*Trudel v. Lifebit Biotech*,
2022 WL 16695171 (M.D. Fla. Nov. 3, 2022) ...............................................19

*United States v. State St. Bank & Tr. Co.*,
520 B.R. 29 (Bankr. D. Del. 2014) ........................................................22

*Valley Media v. Borders (in Re Valley Media)*,
288 B.R. 189 (Bankr. D. Del. 2003) .......................................................7

*Vision Dev. Grp. of Broward Country, LLC v. TMG Sunrise, LLC (In re Vision Dev. Grp. Of Broward Country, LLC)*,
411 B.R. 768 (Bankr. S.D. Fla. 2009) .....................................................10

*Vorchheimer v. Philadelphian Owners Ass'n*,
903 F.3d 100 (3d Cir. 2018) ............................................................6, 12

*Walnut Creek Mining Co. v. Cascade Inv., LLC (In re Optim Energy, LLC)*,
527 B.R. 169 (D. Del. 2015) ..............................................................21

*World O World Corp. v. Patino*,
306 So. 3d 1044 (Fla. Dist. Ct. App. 2020) ...........................................10, 18

iv

**Statutes**

11 U.S.C. §547(b) ..................................................................................................7, 9

Fla. Stat. Ann. § 559.9611(1)..........................................................................11

Fla. Stat. Ann. § 559.9611(7)..........................................................................11

Fla. Stat. Ann. §559.9612 ...............................................................................11

Federal Rule of Civil Procedure 11(b)(2)-(3) ................................................2

Federal Rule of Civil Procedure 12(b)(6) ...................................................1, 5

### STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

On August 4, 2025, Debtors[1] (1) filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, and (2) commenced the instant adversary proceeding. On August 22, 2025, Debtors filed a First Amended Complaint. This Court then entered an Order affording defendant White Star Funding Inc. d/b/a TVT Cap ("TVT Cap") until October 13, 2025 to respond. TVT Cap now moves for partial dismissal of the First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

### INTRODUCTION

Relying on conclusory and inaccurate allegations that contradict the plain language of the agreements at issue, Debtors try to paint TVT Cap as a "predatory" lender that sought to "evade usury laws." There is nothing in Debtors' agreements with TVT Cap or in the substantive allegations of the First Amended Complaint to support that characterization. Indeed, the agreements at issue for themselves, and Debtors' *ad nauseum* repetition of the word "loan" does not change the fact that Debtors and TVT Cap participated in legitimate accounts receivable purchase transactions of the kind that have been repeatedly recognized as valid and enforceable under Florida law.[2]

While TVT Cap recognizes that there have been bad apples in the merchant cash advance industry, TVT Cap must be judged based on its own conduct, not on what other entities, including its co-defendants in this case, may have done. Debtors cannot rely on name-calling and insinuations of guilt by association to overcome indisputable facts.

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification numbers, are: AGDP Holding Inc. (6504); Avant Gardner, LLC (6504); AG Management Pool LLC (9962); EZ Festivals LLC (8854); Made Event LLC (6272); and Reynard Productions, LLC (5431). The Debtors' service address is 140 Stewart Ave. Brooklyn, NY 11237, Attn: General Counsel.

[2] As stated in section III of this Memorandum, Debtors acknowledge that their relationship with TVT Cap is governed by Florida law.

1

Debtors' First Amended Complaint is also deficient in multiple ways. In some instances, Debtors fail to plead the elements of their claims with the requisite specificity. In others, Debtors fail to plead the elements at all. Whether Debtors lack a sufficient basis to support their claims as required by Federal Rule of Civil Procedure 11(b)(2)-(3) or are simply unfamiliar with the applicable pleading requirements, TVT Cap is entitled to fair notice of nature of Debtors' claims, which means that Debtors must present the factual basis for the legal theories asserted. The First Amended Complaint does not meet that basic standard.

**STATEMENT OF UNDISPUTED FACTS**

**The Agreements**

On or about February 3, 2025, Debtors entered into a Standard Merchant Cash Advance Agreement with TVT Cap. *First Amended Complaint* ("FAC") (D.I. 7), Ex. B (D.I. 7-2). Debtors and TVT Cap subsequently entered into a second Standard Merchant Cash Advance Agreement, dated March 13, 2025. FAC, Ex. E (D.I. 7-5). Other than the dates and certain financial terms, the February 3, 2025 Agreement and the March 13, 2025 Agreement (jointly, the "Agreements") are identical. *Compare* FAC, Ex. B *with* FAC, Ex. E.

The Agreements contemplated that TVT Cap would purchase a specific amount of Debtors' future receivables (*i.e.*, payments that Debtors might receive from their customers in the future). FAC, Ex. B at pg. 1 and § 1; FAC, Ex. E at pg. 1 and § 1. More specifically, TVT Cap would pay Debtors a lump sum "Purchase Price" in exchange for a "Receivables Purchased Amount" that TVT Cap could collect from Debtors' future revenue. *Id.* The Agreements did not, however, require Debtors to immediately begin turning over all their receivables to TVT Cap. Instead, the Agreements provided that TVT Cap would receive no more than a "Specified Percentage" of Debtors' future receivables each week. *Id.*

2

Given that Debtors' future receivables were likely to vary from week to week, and because of the difficulties associated with calculating the exact value of each Debtor's receivables on a weekly basis, the Agreements established an "Initial Estimated Payment" based on Debtors' projected weekly receipts. FAC, Ex. B at pg. 1 and § 3; FAC, Ex. E at pg. 1 and § 3. The Initial Estimated Payment reflected the parties' agreement as to the approximate value of the Specified Percentage of Debtors' weekly receivables going forward. FAC, Ex. B §§ 1 and 3; FAC, Ex. E §§ 1 and 3. For example, if the parties agreed that Debtors were likely to collect one thousand dollars a week from customers, and the parties also agreed to a Specified Percentage of ten percent, the Initial Estimated Payment would be one hundred dollars a week.

The Agreements confirmed that the Initial Estimated Payment was, in fact, just an estimate and was not intended to result in TVT Cap receiving more than the Specified Percentage of Debtors' receivables. FAC, Ex. B §§ 3-4; FAC, Ex. E §§ 3-4. Indeed, the Agreements protected against over collection in three important ways.

First, the Agreements included "Reconciliations" clauses to ensure that the payments made to TVT Cap reflected the Specified Percentage of Debtors' actual receivables. FAC, Ex. B § 4; FAC, Ex. E § 4. Debtors could, at any time, request a reconciliation by simply emailing TVT Cap and providing certain bank account information that TVT Cap would need to confirm the value of the receivables Debtors had collected from customers. FAC, Ex. B § 4 and Declaration of Ordinary Course of Business ¶ 10; FAC, Ex. E § 4 and Declaration of Ordinary Course of Business ¶ 10.

TVT Cap was required to complete the reconciliation within two business days, and if the reconciliation revealed that TVT Cap had collected more than Specified Percentage, TVT Cap was required to (1) refund all excess payments that TVT Cap had already received from Debtors; and

3

(2) lower any estimated payment to better approximate the value of Debtors' future receivables going forward. FAC, Ex. B § 4; FAC, Ex. E § 4.

Second, recognizing that the time it took TVT Cap to collect the Receivables Purchased Amount depended on the value of Debtors' receivables, the Agreements confirm that Debtors were not required to pay the Receivables Purchased Amount to TVT Cap by any date certain. FAC, Ex. B § 6; FAC, Ex. E § 6 ("The term of this Agreement is indefinite and shall continue until [TVT Cap] receives the full Receivables Purchased Amount").

Finally, Debtors' inability to make payments to TVT Cap did not constitute a breach of the Agreements. FAC, Ex. B § 30; FAC, Ex. E § 30. Debtors would only be considered in default if they either (1) made false or misleading representations or warranties to TVT Cap, or (2) took affirmative steps, without notice, to prevent TVT Cap from collecting the Receivables Purchased Amount. FAC, Ex. B § 30; FAC, Ex. E § 30. As the Agreements make clear:

> [TVT Cap] is entering into this Agreement knowing the risks that each [Debtor's] business may decline or fail, resulting in [TVT Cap] not receiving the Receivables Purchased Amount. Any [Debtor] going bankrupt, going out of business, or experiencing a slowdown in business or a delay in collecting Receivables will not on its own without anything more be considered a breach of this Agreement.

FAC, Ex. B § 14; FAC, Ex. E § 14.

**The Lockbox**

As Debtors acknowledge in the First Amended Complaint and other filings, TVT Cap never collected or received any money directly from Debtors. FAC ¶¶ 4 and 67; *AGDP Holding Inc., et al.*, Case No. 25-11446, *Debtors' Motion for Entry of Interim and Final Orders* (D.I. 12), ¶ 44. Instead, Debtors authorized their credit card processors to remit funds directly to defendant TVT Capital Source LLC's lockbox account (the "Lockbox"). *Id.* TVT Capital Source LLC would then disburse a portion of those funds to TVT Cap and the other defendants in this case (collectively, "Defendants") and remit the remaining balance to Debtors. *Id.*

4

Debtors allege that between January 31, 2025 and August 1, 2025, Defendants collected a total of $3,789,972 from the funds that Debtors' credit card processors deposited into the Lockbox. FAC ¶ 70. Debtors further allege that $2,103,900 of that $3,789,972 was collected during the ninety-day preference period. FAC ¶ 67.

**The First Amended Complaint**

In their First Amended Complaint, Debtors assert five claims for relief against TVT Cap. Debtors seek to (1) avoid unperfected security interests and recover transfers made to Defendants (Count I), (2) avoid and recover preferential transfers (Count II), (3) disallow claims (Count III), (4) avoid and recover constructive fraudulent transfers (Count IV), and (5) obtain a judgment declaring that any claim Defendants may have is an unsecured claim (Count V).

While it disputes that it has not perfected its security interest in Debtors' assets, TVT Cap recognizes that this issue involves questions of fact that are not properly resolved on a motion to dismiss. TVT Cap is, however, now moving to dismiss all of Debtors' other claims.

LEGAL STANDARD ON A MOTION TO DISMISS PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)

To survive a motion to dismiss pursuant to Rule 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility requires that the complaint's factual allegations give rise to an inference of liability sufficient to move the claims "across the line from conceivable to plausible." *Id.* at 680 (quotation marks omitted). Mere "labels and conclusions" are not enough, and a "formulaic recitation of the elements of a cause of action will not do." *Id.*   The notion that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions and

5

threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 663.

When "decid[ing] a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citing *Pension Benefit Guar Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). Furthermore, where the allegations in a complaint contradict the attached exhibits, the exhibits control. *See Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 112 (3d Cir. 2018).

## LEGAL ARGUMENT

**I.      This Court should dismiss the portion of Count I that seeks to recover funds transferred to TVT Cap, because Debtors fail to allege any legal basis to support that relief.**

In Count I of the First Amended Complaint, Debtors rely on section 544(a) in seeking (1) to avoid any unperfected liens or security interests held by Defendants in Debtors' property; and (2) recover transfers in the amount of $3,789,972 from Defendants. FAC at pg. 28 (Prayer for Relief).

With respect to Debtors' request for judgment avoiding unperfected liens or security interests, TVT Cap disputes that it has not perfected its security interest in Debtors' assets. However, TVT Cap is not currently moving to dismiss that portion of Count I.

As to Debtors' assertion that they should be permitted to recover transfers in the amount of $3,789,972, it is unclear what legal basis Debtors are relying on in seeking that relief. Even if TVT Cap was found to be an unsecured creditor, that fact alone would not support a judgment requiring TVT Cap to return any money it collected under the Agreements. To the extent Debtors may be basing their request to recover transfers on theories described in other Counts of the First Amended

6

Complaint, this Court should dismiss that portion of Count I for the reasons set forth in subsequent sections of this Memorandum.

II.   **This Court should dismiss Count II, which seeks to avoid preferential transfers, because Debtors fail to plead (A) the identity of the debtor/transferor; (B) that the transfers enabled TVT Cap to receive more than it would have if the case was a Chapter 7 liquidation, etc.; and (C) that the claim was asserted based on reasonable due diligence.**

With Count II of the First Amended Complaint, Debtors proceed pursuant to section 547(b) in seeking to avoid and recover the $2,103,900 that Defendants allegedly collected from the Lockbox during the preference period. FAC at pgs. 28-29 (Prayer for Relief). Debtors, however, fail to adequately plead the necessary elements of a claim to avoid preferential transfers.

To establish a viable claim under section 547(b), Debtors must allege that the transfers at issue: (1) were made to or for the benefit of TVT Cap; (2) were for or on account of an antecedent debt; (3) were made while Debtors were insolvent; (4) were made on or within 90 days of the petition date; and (5) enabled TVT Cap to receive more than it would have if (a) the case was a Chapter 7 liquidation, (b) the transfer had not been made, and (c) TVT Cap received payment of the debt to the extent provided by the Bankruptcy Code. 11 U.S.C. §547(b).

To survive a motion to dismiss Debtors' preferential transfer claim, the First Amended Complaint must include "(a) an identification of the nature and amount of each antecedent debt and (b) an identification of each alleged preference transfer by (i) date, (ii) name of debtor/transferor, (iii) name of transferee and (iv) the amount of the transfer." *See Valley Media v. Borders (in Re Valley Media)*, 288 B.R. 189, 192 (Bankr. D. Del. 2003). Furthermore, Debtors must allege that the claim is "based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses under subsection (c)." 11 U.S.C.S. §547(b); *see Pinktoe Liquidation Trust v. Charlotte Olympia Dellal*

7

*(In re Pinktoe Tarantula Ltd)*, No. 20-50597, 2023 WL 2960894, at *3 (Bankr. D. Del. Apr. 14, 2023).

As discussed below, Debtors either ignore their pleading obligations or fail to plead the elements of a preference claim with the requisite specificity.

### A.    Debtors fail to identify the debtor/transferor that made the alleged preferential transfers.

"Case law in this jurisdiction makes clear that when there are multiple debtors in the case, to plead a preference claim the trustee must identify the specific debtor that made the allegedly preferential transfer." *Miller v. Nelson (In re Art Inst. of Phila. LLC)*, No. 20-50627, 2022 WL 18401591, at *19 (Bankr. D. Del. Jan. 12, 2022). In this case, Debtors neither name the credit card processors that transferred funds to the Lockbox nor identify the Debtors that were serviced by those processors. Throughout the First Amended Complaint, Debtors refer to themselves, collectively, as Avant Gardner. FAC at pg. 1. As a result, when Debtors allege that "[d]uring the Preference Period, Avant Gardner transferred a total of $2,103,900 to [TVT Capital Source LLC]" [FAC ¶ 67], it is impossible to determine which of the Debtors made the alleged transfers. For that reason alone, this Court should dismiss Count II of the First Amended Complaint. *See Beskrone v. Opengate Capital Grp., LLC (In re Pennysaver USA Publ'g, LLC)*, 602 B.R. 256, 274 (Bankr. D. Del. 2019) ("The fact that the exact identity of the Debtor transferor was not alleged is sufficient grounds to dismiss this claim.").

### B.    Debtors fail to plead that the alleged transfers enabled TVT Cap to receive more than it would have if the case was a Chapter 7 liquidation, the transfer had not been made, and TVT Cap received payment of such debt to the extent provided by the Bankruptcy Code.

In support of their claim to avoid and recover the funds allegedly collected from the Lockbox during the preference period, Debtors do not plead the elements set forth in section 547(b)(5). Although Debtors do plead those elements in connection with the UCC-1 financing

8

statement purportedly filed by defendant Insta Funding LLC [FAC ¶ 95], Debtors do not allege that any transfers enabled TVT Cap to receive more than it would have if the case was a Chapter 7 liquidation. As a result, Debtors fail to meet their burden to plead a viable claim under section 547(b)(5).

Furthermore, even if they had directed their existing allegations to the alleged preference payments (as opposed to the UCC-1 financing statement filed by Insta Funding LLC), Debtors' failure to include anything more than a "formulaic recitation" of the language of section 547(b)(5) would also support dismissal. *See Miller v. Easy Star Records (In re DA Liquidating Corp.)*, 622 B.R. 172, 176 (Bankr. D. Del. 2020) ("Without a sufficient factual predicate, a complaint supported merely through the formulaic recitation of the §547 factors and conclusory allegations will not survive a motion to dismiss.").

### C.    Debtors fail to allege that their claim to avoid preferential transfers was asserted based on reasonable due diligence.

As with their failure to plead the elements set forth in section 547(b)(5), Debtors ignore their obligation to allege that the preference claim is "based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses." 11 U.S.C.S. §547(b); *In re Pinktoe Tarantula Ltd*, 2023 WL 2960894, at *3. The First Amended Complaint does not include any allegations related to, much less describing, due diligence performed by Debtors. This Court should, therefore, dismiss Count II. *See id.* at *5.

Debtors' apparent failure to conduct the necessary due diligence is particularly concerning because a good-faith review of Debtors' business dealings over the last five years would very likely establish that TVT Cap has a valid affirmative defense under section 547(c)(2)(A). *See Official Comm. of Unsecured Creditors v. LG Funding, LLC (In re Cornerstone Tower Servs.)*, No. 16-40787, 2018 WL 6199131, at *10 (Bankr. D. Neb. Nov. 9, 2018) (noting that a valid defense under

9

section 547(c)(2)(A) could be found where the debtor had entered into multiple accounts receivable purchase transactions with "various companies for several years before filing bankruptcy.").

### III. This Court should dismiss Count III because the plain language of the Agreements and Debtors' own allegations make clear that the transactions at issue were sales, not loans.

In Count III of the First Amended Complaint, Debtors ask this Court to "enter judgment disallowing, in whole or in part, any claims filed or asserted by Defendants that are unenforceable under applicable non-bankruptcy law due to usury, unconscionability, or illegality." FAC at pg. 29 (Prayer for Relief). Debtors' attempt to mischaracterize the funding they received from TVT Cap as an illegal, usurious loan fails because TVT Cap did not make loans to Debtors.

Under Florida Law, which Debtors acknowledge applies to the Agreements [FAC ¶¶ 29 and 45], the four elements of usury are:

> (1) an express or implied loan; (2) an understanding between the parties that the money lent is to be returned; (3) an agreement to pay a greater rate of interest than the law allows; and (4) a corrupt intent to take more than the allowable legal rate of interest for the use of the loaned money.

*Vision Dev. Grp. of Broward Country, LLC v. TMG Sunrise, LLC (In re Vision Dev. Grp. Of Broward Country, LLC)*, 411 B.R. 768, 772 (Bankr. S.D. Fla. 2009) (citing *Dixon v. Sharp*, 276 So. 2d 817, 819-20 (Fla. 1973)).

"It is well-settled that the determination of whether a transaction is either civilly or criminally usurious is made at the inception of the loan." *World O World Corp. v. Patino*, 306 So. 3d 1044, 1045 (Fla. Dist. Ct. App. 2020) (citations omitted). Furthermore, courts tasked with determining whether a transaction constitutes a usurious loan are "guided by the established principle of Florida law that when a financing arrangement claimed to be usurious is capable of more than one construction, courts are to presume a lawful, rather than an unlawful, purpose." *In*

10

*re Transcapital Fin. Corp.*, 433 B.R. 900, 907 (Bankr. S.D. Fla. 2010) (citing *L'Arbalete, Inc. v. ZACZAC*, 474 F. Supp.2d 1314, 1324 (S.D. Fla. 2007)).

In the instant case, and as discussed in more detail below, the Agreements and the substantive allegations in the First Amended Complaint unequivocally establish that the transactions at issue were sales, not loans. Therefore, Debtors cannot plead the first element of usury, and their usury claim fails as a matter of law. *See JLK Constr., LLC v. Alva Advance, LLC*, Nos. 23-50034, 23-4030, 2025 Bankr. LEXIS 1573, at *17-19 (holding that under Florida law a usury claim was subject to dismissal where the debtor fails to adequately allege that an accounts receivable purchase transaction was a loan); *Nolden v. Summit Fin. Corp.*, 244 So. 3d 322, 328 (Fla. Dist. Ct. App. 2018) ("The law is well settled that usury can only attach to a loan of money, or to the forbearance of a debt.") (citations and quotation marks omitted).

### A.    The Florida Commercial Financing Disclosure Law recognizes that accounts receivable purchase transactions are not loans.

The Florida Commercial Financing Disclosure Law (the "FCFDL") [Fla. Stat. Ann. §559.961, et seq.], which applies to transactions consummated on or after January 1, 2024 [Fla. Stat. Ann. §559.9612], clearly distinguishes between "commercial loan[s]" and "accounts receivable purchase transaction[s]" like the ones at issue in this case. *Compare* Fla. Stat. Ann. § 559.9611(1), *with* Fla. Stat. Ann. § 559.9611(7). The FCFDL also states that "the provider's characterization of an accounts receivable purchase transaction as a purchase is conclusive that the accounts receivable purchase transaction is not a loan or a transaction for the use, forbearance, or detention of money." Fla. Stat. Ann. § 559.9611(1); *see JLK*, 2025 Bankr. LEXIS 1573, at *11 n. 27 (noting that, as of the effective date of the FCFDL, "merchant cash advances are not loans by Florida statute."),[3] *see also* FAC, Ex. B § 14; FAC, Ex. E § 14 ("Each [Debtor] and [TVT Cap]

---

[3] The transactions at issue in *JLK* occurred prior to the FCFDL's effective date. *See id.*

agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from [TVT Cap] to any [Debtor].").

At a minimum, the FCFDL confirms that a purchase of receivables is a legitimate financing arrangement under Florida law that should not be recharacterized absent clear indicia of a loan. As discussed below, there is nothing in the Agreements to suggest that the transactions at issue were loans. This Court should, therefore, dismiss Count III of the First Amended Complaint to the extent Debtors seek to limit the enforceability of the Agreements on the basis of usury or illegality. *See JLK*, 2025 Bankr. LEXIS 1573, at \*11-17 (applying Florida law in granting a motion to dismiss a usury claim where the parties' agreements did not support the debtor's contention that a sale of receivables should be deemed a loan).

### B.    The terms of the Agreements and the substantive allegations in the First Amended Complaint make clear that Debtors and TVT Cap engaged in accounts receivable purchase transactions, not loans.

Even prior to the FCFDL, courts applying Florida law consistently held that contracts akin to the Agreements between Debtors and TVT Cap do not include the traditional indicia of a loan. *See*, *e.g.*, *JLK*, 2025 Bankr. LEXIS 1573, at \*11-17; *In re McKenzie Contracting, LLC*, No. 24-01255, 2024 WL 3508375 (Bankr. M.D. Fla. July 19, 2024). Debtors cannot rely on the conclusory and inaccurate allegations in the First Amended Complaint to avoid that result. *See Vorchheimer*, 903 F.3d at 112 (where allegations in a complaint contradict the attached exhibits, "the exhibits control").

Although Florida courts have not established an exhaustive list of factors to consider in distinguishing between a purchase of receivables and a loan, "[t]he deciding factor in the 'sale' versus 'loan' dispute is generally the transfer of risk." *In re McKenzie Contracting*, 2024 WL 3508375, at \*2; *see JLK*, 2025 Bankr. LEXIS 1573, at \*12-13 ("Florida state courts . . . look to the

12

risk allocation under the terms of the agreement."). "[I]f the 'buyer' is absolutely entitled to repayment under all circumstances, then the risk remains with the 'seller' and the transaction is considered a loan." *McKenzie Contracting*, 2024 WL 3508375, at *2. However, "[i]f the repayment date and repayment amount on the transaction is contingent or dependent upon the success of the underlying venture, then the transaction is more likely to be characterized as a sale because the purchaser bears the risk of loss." *JLK*, 2025 Bankr. LEXIS 1573, at *13 (citations omitted); *see Craton Entm't, LLC v. Merch. Capital Grp., LLC*, 314 So. 3d 627 (Fla. Dist. Ct. App. 2021) (per curiam), reh'g denied (Feb. 17, 2021) (citing *Saralegui v. Sacher, Zelman, Van Sant Paul, Beily, Hartman & Waldman, P.A.*, 19 So. 3d 1048, 1051 (Fla. Dist. Ct. App. 2009), for the proposition that a "transaction is not indicative of a loan where repayment obligation is not absolute, but rather contingent or dependent upon the success of the underlying venture.").

In conducting a risk of loss analysis, courts have considered several different factors, including whether the agreement in question (1) includes a true (*i.e.*, nondiscretionary) reconciliation provision, (2) requires full payment within a set timeframe (as opposed to an indefinite term), or (3) contains default provisions that are triggered when the seller experiences a decline in revenue or files for bankruptcy protection. *See JLK*, 2025 Bankr. LEXIS 1573, at *13-17; *McKenzie Contracting*, 2024 WL 3508375, at *2-3. In the present case, all these factors strongly support the conclusion that Debtors' transactions with TVT Cap were sales, not loans.

### (i) The Agreements contain true reconciliation provisions, which support the conclusion that the transactions were sales, not loans.

In the context of an agreement for the sale of future receivables, a reconciliation provision allows the seller to request that the buyer review the seller's bank records to determine if the amounts collected by the buyer correspond with the value of the seller's actual revenue. *See McKenzie Contracting*, 2024 WL 3508375, at *3. To be considered a "true" reconciliation

13

provision, the language in the agreement must (1) give the seller a right to request reconciliation; and (2) require the buyer to complete the reconciliation and make appropriate adjustments to ensure that the seller's payments to the buyer correspond with the seller's receivables. *See id.* When the buyer can neither reject a request for reconciliation nor refuse to account for overpayments, the buyer is bearing the risk that the seller's revenue might decline or dry up altogether, which is different from a traditional loan where the borrower is required to make fixed payments regardless of actual revenue. *See id.*; *cf. JLK*, 2025 Bankr. LEXIS 1573, at *13 ("If the repayment date and repayment amount on the transaction is contingent or dependent upon the success of the underlying venture, then the transaction is more likely to be characterized as a sale because the purchaser bears the risk of loss.") (citing *Saralegui*, 19 So. 3d at 1051). Simply put, "[I]f a seller is doing poorly, the seller will pay less and will receive a refund of anything taken by the buyer exceeding the specified percentage (which often can also be adjusted downward)." *McKenzie Contracting*, 2024 WL 3508375, at *2 (quotation marks, citations and alterations omitted).

Here, the reconciliation provisions in the Agreements are unmistakably nondiscretionary in that they require TVT Cap to perform reconciliations upon request, reimburse Debtors for prior overpayments, and if necessary, reduce any estimated payment to better reflect the value of Debtors' receivables going forward. Indeed, in addition to confirming that Debtors had the "right to request a reconciliation of the payments made under the Agreement at any time" [FAC, Ex. B § 4 and Declaration of Ordinary Course of Business ¶ 10; FAC, Ex. E § 4 and Declaration of Ordinary Course of Business ¶ 10], the Agreements provide that TVT Cap (1) "*will* complete each reconciliation requested by any [Debtors] within two business days," (2) "*will* credit to [Debtors' deposit account] all amounts to which [TVT Cap] was not entitled," and (3) "*will* . . . modify the amount of the Estimated Payment so that it is consistent with the Specified Percentage of

14

[Debtors'] Receivables from the date of the Agreement through the date of the reconciliation." FAC, Ex. B § 4; FAC, Ex. E § 4 (emphasis added).

There is nothing in the Agreements to suggest that TVT Cap had any discretion to deny a request for reconciliation or to retain overpayments. Accordingly, this factor weighs in favor of concluding that the transactions at issue were sales, not loans. *See JLK*, 2025 Bankr. LEXIS 1573, at *13-14 (holding that the debtor failed to sufficiently allege that a sale of receivables was a loan where the reconciliation provision stated that buy "will" perform reconciliations upon request and "will" reimburse seller for overpayments).

### (ii)    The terms of the Agreements were indefinite, which also supports the conclusion that the transactions were sales, not loans.

In contrast to a loan where the borrower is typically required to repay the debt on a fixed schedule, payments made pursuant to a sale of future receivables can vary based on the seller's revenue. *See McKenzie Contracting*, 2024 WL 3508375, at *3. If the seller's revenue declines, it will take longer for the seller to satisfy its payment obligations to the buyer. If the seller goes out of business, the buyer will not be paid at all. A buyer of future receivables, therefore, bears the risk that the seller's business will decline or fail. *See id.* ("[A]n indefinite term of receiving a fixed percentage of actual receipts may suggest that the [buyer] has assumed the risk associated with the receivables not being collectable.") (quotation marks, citations and alterations omitted).

The Agreements at issue in this case expressly state that their terms are indefinite, and there is nothing in the Agreements to suggest otherwise. FAC, Ex. B § 6; FAC, Ex. E § 6. Indeed, Debtors admit that (1) "the weekly receipts [due to TVT Cap] vary based on [Debtors'] economic performance" [FAC ¶ 28]; (2) "there was no set maturity date" [*id.* ¶ 30]; and (3) "there was . . . no term limit on repayment" [*id.* ¶ 46].

For reasons that are not entirely clear, Debtors make much of the fact an unexpected increase in their revenue would result in shorter payment terms. FAC ¶¶ 31 and 46. Debtors, however, fail to acknowledge the obvious: that an unexpected decrease in Debtors' revenue would result in longer payment terms. This is exactly how a legitimate accounts receivable purchase transaction works. Accordingly, the second factor also weighs in favor of concluding that the transactions at issue were sales, not loans. *See JLK*, 2025 Bankr. LEXIS 1573, at *13; *McKenzie Contracting*, 2024 WL 3508375, at *3.

> (iii)    **The default provisions in the Agreements were not triggered when Debtors experienced a decline in revenue or filed for bankruptcy protection, which further supports the conclusion that the transactions were sales, not loans.**

A default provision that is not triggered by mere nonpayment or bankruptcy further supports the conclusion that a transaction was a sale, not a loan under Florida law. *See JLK*, 2025 Bankr. LEXIS 1573, at *15-16 ("[W]hether the court should recharacterize the merchant cash advances as loans depends on whether the contracts include broad events of default making payment noncontingent, such as bankruptcy or nonpayment."); *McKenzie Contracting*, 2024 WL 3508375, at *3-5. In this case, the default provisions in the Agreements are only triggered in the event Debtors engaged in misconduct, like making false representations, concealing receivables, or blocking payments without notice. FAC, Ex. B § 30; FAC, Ex. E §30. Debtor's inability to pay did not constitute a default. Indeed, the Agreements make clear that:

> Any Merchant [*i.e.*, any Debtor] going bankrupt, going out of business, or experiencing a slowdown in business or a delay in collecting Receivables will not on its own without anything more be considered a breach of this Agreement. Notwithstanding any provision in this Agreement to the contrary, no act or omission by a Merchant after it goes out of business, during the pendency of any voluntary or involuntary bankruptcy case in which the Merchant is a debtor, or after the Merchant is granted a discharge or the equivalent thereof in any bankruptcy case will cause that Merchant to be in default of this Agreement.

FAC, Ex. B § 14; FAC Ex. E § 14.

16

As the default provisions in the Agreements are clearly not triggered by mere nonpayment or bankruptcy, this Court should refuse to recharacterize Debtors' transactions with TVT Cap as loans. *See JLK*, 2025 Bankr. LEXIS 1573, at *15-16; *McKenzie Contracting*, 2024 WL 35083735, at 3-5.

The introductory section of the First Amended Complaint includes broad allegations about "severe default penalties and legal fees" that are not present in the Agreements between Debtors and TVT Cap.[4] However, even assuming *arguendo* that the Agreements did include severe remedies in the event of default, those remedies would not support Debtors' contention that the transactions at issue are loans. As the JLK Court explained, absent "broad events of default making payment noncontingent, such as bankruptcy or nonpayment," allegations as to the mere existence of default remedies are "insufficient for [the debtor] to successfully plead the contracts were loans." *JLK*, 2025 Bankr. LEXIS 1573, at *15-17. Therefore, the third factor further supports the conclusion that the transactions between TVT Cap and Debtors were sales, not loans.

Debtors' attempt to portray the two rounds of funding they received from TVT Cap as usurious loans is not supported by the Agreements or the allegations in the First Amended Complaint. Therefore, Debtors' usury claim fails as a matter of law and should be dismissed.

**IV.    Even assuming *arguendo* that the transactions at issue were loans, this Court should still dismiss Count III because those loans were not usurious, and Debtors do not plead intent with the requisite specificity.**

Even assuming *arguendo* that the transactions were loans, the Agreements did not impose an absolute obligation or fixed payment term that would support a claim for usury, and Debtors fail to adequately allege that TVT Cap acted with corrupt intent.

---

[4] Contrary to the allegations in the First Amended Complaint, the Agreements included a default fee of just $2,500 [FAC, Ex. B § 2(D); FAC, Ex. E § 2(E)], and a standard provision requiring Debtors to pay TVT Cap's reasonable attorney fees and costs under certain circumstances [FAC, Ex. B § 38; FAC, Ex. E § 38].

17

"Florida law is in accord with the basic proposition that a loan or financing agreement will not be deemed to be usurious when repayment is made subject to the occurrence of a contingency." *Transcapital Fin. Corp.*, 433 B.R. at 907 (collecting cases). Accordingly, Debtors cannot allege that they received usurious loans from TVT Cap because the Agreements make clear that repayment was contingent on the value Debtors' receivables. Indeed, consistent with the language of the Agreements, Debtors admit that the payments due to TVT Cap would fluctuate based on Debtors' revenue, which might result in TVT Cap being paid either faster or slower. *See* FAC ¶¶ 28-31. That admission alone is fatal to Debtors' usury claim. *See id.* at 907 ("[W]hen a lender risks the principal with the chance of either getting a greater return than the lawful interest rate or possibly getting nothing (if the contingent event fails to occur), there is no usury.") (citations and quotation marks omitted); *World O World Corp.*, 306 So. 3d at 1046 (usury determination "is made at the inception of the loan").

Debtors also do not adequately plead that TVT Cap acted with corrupt intent. "To allege a corrupt intent [under Florida law], the plaintiff must do more than just allege that the defendant received more than the usury interest rate." *JLK*, 2025 Bankr. LEXIS 1573, at *17-18 (citation omitted). As the Florida Supreme Court has explained:

> Florida Courts recognize that usury is largely a matter of intent, and is not fully determined by the fact that the lender actually receives more than law permits, *but is determined by existence of a corrupt purpose in the lender's mind to get more than legal interest for the money lent*. To work a forfeiture under the statute the principal must knowingly and willfully charge or accept more than the amount of interest prohibited.

*Dixon v. Sharp*, 276 So. 2d 817, 820 (Fla. 1973) (emphasis original).

Alleging usury based on "a mere mathematical computation" will not suffice. *Id.* "The plaintiff must 'specifically and affirmatively plead' that the defendant possessed 'an improper

18

motive in his mind to get more than the legal interest.'" *JLK*, 2025 Bankr. LEXIS 1573, at *18

(quoting *Dixon*, 276 So. 2d at 821). In the present case, Debtors have not done so, and their usury

claim should be dismissed as a matter of law.

**V.     This Court should dismiss Count III to the extent Debtors seek to invalidate the Agreements as unconscionable, because Debtors fail to plead a viable claim for unconscionability under Florida Law.**

To challenge a contract as unconscionable under Florida law, a plaintiff must plead

substantive and procedural unconscionability. *See Pendergast v. Sprint Nextel Corp.*, 592 F.3d

1119, 1134 (11th Cir. 2010). Procedural unconscionability addresses the absence of meaningful

choice and substantive unconscionability looks to the unreasonableness of the contract's terms.

*See Trudel v. Lifebit Biotech*, 2022 WL 16695171, at *4 (M.D. Fla. Nov. 3, 2022). Here, where

Debtors do not allege the absence of meaningful choice, this Court should dismiss Count III to the

extent Debtors seek to void the Agreements as unconscionable.

**VI.    This Court should dismiss Count IV, which seeks avoidance of constructive fraudulent transfers, because Debtors do not to adequately plead that there was a transfer for less than reasonably equivalent value at a time when the Debtors were insolvent.**

In Count IV of First Amended Complaint, Debtors proceed pursuant to section

548(a)(1)(B) in seeking to avoid and recover an unspecified amount of constructive fraudulent

transfers. FAC at pg. 29 (Prayer for Relief). Debtors attempt to support this claim by simply

parroting the statutory elements forth in section 548(a)(1)(B). *See* FAC ¶ 116-17. This approach is

clearly inadequate. Debtors must, but have not, allege sufficient facts to support their claim against

TVT Cap. *See Ctr. City Healthcare, LLC v. McKesson Plasma & Biologics LLC (In re Ctr. City*

*Healthcare, LLC)*, 641 B.R. 793, 803 (Bankr. D. Del. 2022) (noting that in the context of a claim

under section 548(a)(1)(B), "[t]he pleading party cannot rely on reciting statutory elements but

must allege facts with sufficient particularity to establish its claim.").

Debtors offer no specific facts to support the conclusory allegation that Debtors were either insolvent at the time of the alleged transfers or were rendered insolvent by virtue of those transfers. *See Phillips v. Josmic 2 LLC (In re ONH AFC CS Inv'rs, LLC)*, 671 B.R. 680, 697 (Bankr. D. Del. 2025) (granting motion to dismiss where complaint offered "no specific facts about the debtor's assets and liabilities at the date(s) of the challenged transfers" and no "specific facts that would support an allegation that the debtor was left insolvent as a result of the transfers"); *In re Ctr. City Healthcare, LLC*, 641 B.R. at 804-05 (Bankr. D. Del. 2022) (granting motion to dismiss where complaint did "not allege any facts relative to the Debtors' insolvency at the time of the Transfers but merely recites the language of the statute.").

Nor do Debtors offer any allegations to support the contention that Debtors received less than reasonably equivalent value in exchange for the transfers. Notably, because the transactions at issue were not loans, Debtors cannot rely on irrelevant allegations of usurious interest rates to avoid dismissal. Instead, the First Amended Complaint must include facts that would allow this Court "to discern the value of the transactions if they gave rise to sales." *See JLK*, 2025 Bankr. LEXIS 1573, at *45-46. As the *JLK* Court explained:

> [Debtor] has not sufficiently pled that the transactions are loans. And though the value these transactions would provide [Debtor] as sales is an evidentiary issue that the court would not ordinarily decide on a motion to dismiss, [Debtor] makes no allegations whatsoever from which the court could discern the value of the transactions if they gave rise to sales, such as allegations regarding the effective interest rates ordinarily available to similarly situated debtors seeking alternative forms of financing. . . . [Debtor], therefore, does not sufficiently plead lack of reasonably equivalent value.

*JLK*, 2025 Bankr. LEXIS 1573, at *45-46 (citing *Stoebner v. Opportunity Fin., LLC*, 909 F.3d 219, 226 [8th Cir. 2018] for the proposition that an "unsupported allegation that interest rate debtor received was above the market rate did not satisfy plaintiffs burden to plead lack of reasonably

20

equivalent value for the repayment of similar financing arrangements in the debtor's specific market.").

Because Debtors fail to adequately plead insolvency or lack of reasonable equivalent value, this Court should dismiss Debtors' claim to avoid and recover alleged constructive fraudulent transfers.

**VII.    This Court should dismiss Count V to the extent Debtors seek equitable subordination, because Debtors fail to plead the elements of that claim.**

With Count V of the First Amended Complaint, Debtors ask this Court to enter a judgment declaring that "to the extent any Defendant has a claim, it is an unsecured claim." FAC at pg. 29 (Prayer for Relief). TVT Cap disputes that it has an unsecured claim but recognizes that this issue involves questions of fact that are not properly resolved on a motion to dismiss. That said, in the body of the First Amended Complaint, Debtors also appear to request additional relief. FAC ¶¶ 125(a)-(f). Some of that relief is not directed toward TVT Cap [*id.* ¶ 125(b)], while other relief is duplicative of the relief sought pursuant to other counts of the First Amended Complaint [*id.* ¶¶ 125(a), (c)-(e)], which TVT Cap has already addressed in previous sections of this Memorandum. Debtors, however, do include one request for relief that is not mentioned anywhere else in the First Amended Complaint. Namely, Debtors suggest that this Court should enter judgement declaring that TVT Cap's "security interests are subordinated in relation to other creditors under equitable subordination." FAC ¶ 125(f). To the extent it will consider Debtors' equitable subordination claim, which is not included in the Prayer for Relief, this Court should dismiss that claim because Debtors fail to plead the requisite elements of a claim for equitable subordination.

Equitable subordination is "an extraordinary remedy which is applied sparingly." *Walnut Creek Mining Co. v. Cascade Inv., LLC (In re Optim Energy, LLC)*, 527 B.R. 169, 175 (D. Del.

21

2015) (quoting *In re Epic Capital Corp.*, 307 B.R. 767, 773 (D. Del. 2004)). To plead a viable claim for equitable subordination, a party must adequately allege three elements: "(1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the bankruptcy code." *Citicorp Venture Capital v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 986-87 (3d Cir. 1998).

"The most important factor in determining if a claimant has engaged in inequitable conduct for the purposes of equitable subordination is whether the claimant was an insider or outsider in relation to the debtor at the time of the act." *In re Mid-American Waste Sys.*, 284 B.R. 53, 69 (Bankr. D. Del. 2002). Where, as in this case, "the claimant is not an insider, then evidence of more egregious conduct such as fraud, spoliation or overreaching is necessary." *Official Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC)*, 444 B.R. 51, 79 (Bankr. D. Del. 2010) (citations and quotation marks omitted). Indeed, "[w]hile equitable subordination can apply to an ordinary creditor, the circumstances supporting such a claim are few and far between." *United States v. State St. Bank & Tr. Co.*, 520 B.R. 29, 87 (Bankr. D. Del. 2014).

In the instant case, the First Amended Complaint does not include any allegations that TVT Cap engaged in fraud, spoliation or overreaching. For example, Debtors do not allege that TVT Cap collected more than, or even all of, the Specified Percentage set forth in the Agreements. Nor do Debtors assert that TVT Cap engaged in any improper or overly aggressive collection efforts. Accordingly, this Court should dismiss Count V of the First Amended Complaint to the extent Debtors have assert a claim for equitable subordination.

## CONCLUSION

For the reasons set forth above, this Court should grant TVT Cap's motion in its entirety.

Dated: October 13, 2025

Respectfully submitted,

*/s/ Gregory W. Hauswirth*
Gregory W. Hauswirth (Bar No. 5679)
CAROTHERS & HAUSWIRTH LLP
1007 N. Orange Street, 4th Floor
Wilmington, DE 19801
Telephone: (302) 332-7181
Facsimile: 412-910-7510
Email:  ghauswirth@ch-legal.com

-and-

Steven B. Eichel (pro hac vice pending)
LEECH TISHMAN
ROBINSON BROG, PLLC
One Dag Hammarskjöld Plaza
885 Second Avenue, 3rd Floor
New York, NY 10022
Telephone: (212) 603-6300
Email: seichel@leechtishman.com

*Counsel for White Star Funding, Inc.*